# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

KEVIN TYRONE RUFFIN,

    *Petitioner*,

vs.

DIRECTOR, NEVADA DEPARTMENT OF CORRECTIONS, *et al.*,

    *Respondents.*

2:07-cv-00721-RLH-PAL

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter having come on for an evidentiary hearing before the Court on September 26, 2010, on the merits of the remaining claims, and the Court having received the testimony, evidence and argument presented, does hereby make the following:

## FINDINGS OF FACT

1. Petitioner Kevin Ruffin seeks to set aside his September 28, 2005, amended Nevada state court judgment of conviction, pursuant to a jury verdict in 2000, of burglary and larceny from the person with an adjudication as a habitual criminal. He is serving two concurrent life sentences with the possibility of parole after ten years.

2. The charges arose from two pickpocketing incidents in Las Vegas -- one on February 7, 1999, in an elevator at the Bellagio Hotel and Casino (the "Bellagio") and another on February 18, 1999, in an elevator at the New York-New York Hotel and Casino (the "New York-New York"). In the single trial, the jury hung on the Bellagio counts, and those counts later were dismissed. The jury found Ruffin guilty of the two counts arising from the New York-New York incident.

3. Ruffin's case first came on for trial starting on June 14, 1999. The trial was discontinued, however, on the second day, during voir dire and before the jury had been selected and sworn. The State advised that the elevator surveillance video that had been presented at the preliminary hearing as the video from the February 7, 1999, Bellagio incident in fact was of another incident on the same date. The victim in the charged Bellagio incident, Delores Harris, had advised the State that she was not the victim in the incident in the video. The state trial court discontinued the trial and remanded the matter to the justice court for a new probable cause determination without reliance on the video. See #34, Ex. 1; at 7-10; #35, Ex. 19.

4. Ruffin's original trial counsel thereafter was allowed to withdraw. Stanley A. Walton was appointed as replacement counsel on or about November 18, 1999. Trial was scheduled for January 18, 2000. When the matter came on for trial, the case was being handled by a different state district court judge, prosecutor, and defense counsel in comparison to the first, discontinued trial. See #34, Ex. 1, at 12-16; #35, Ex. 30 (signature line date); compare #35 Ex. 19, at 1 with *id.*, Ex. 36, at 1.[1]

5. Ruffin wanted Walton to proceed to trial as quickly as possible and without any further delay.

6. The trial judge similarly wanted to bring the matter to trial as quickly as possible, to the extent possible, without any further delay.

7. State witness Dan Smolinski testified at trial that he recognized Ruffin in a store surveillance video as the person who used the New York-New York victim's credit card within a day after that incident at his Circle K store, at which he was store manager.

---

[1] The Court did not allow petitioner to pursue a line of cross-examination of Walton at the federal evidentiary hearing as to bar disciplinary and federal criminal proceedings currently pending against him. Petitioner's reliance upon Rule 404(b) of the Federal Rules of Evidence (FRE) is misplaced. The fact that Watson is subject to disciplinary and criminal proceedings in 2009 to 2011 has no relevance to any issue of his "motive" or "intent" in representing Ruffin in 1999 to 2000, other than as prohibited propensity evidence. The provisions of Rule 404(b) do not pertain to the "motive" of a witness in testifying. The applicable rule for referring to other instances of specific conduct in seeking to impeach a witness is FRE Rule 608(b). The Court exercised its discretion under Rule 608(b) to not allow petitioner to pursue the line of inquiry sought.

8. Walton knew of the Circle K surveillance video and requested to see it prior to trial. However, he made a strategic decision to not press the matter further prior to trial. He did so to avoid being the cause of the State introducing evidence that he had been informed was inculpatory and which would show another alleged criminal act by Ruffin.

9. The State did not present the Circle K video at trial. Dan Smolinski testified at trial that he had given the tape to the police. #36, Ex. 38, at 207-08. Detective Carolynne Wolfe Beckerle[2] testified at trial that she believed that she had received the tape from Smolinski and forwarded the tape to the forgery unit. #36, Ex. 39, at 279.

10. When the State did not present the Circle K video at trial, Walton used that fact to argue that the State's failure to present the tape meant that it did not support Smolinski's testimony. See #36, Ex. 39, at 329, lines 15-23. Indeed, Walton came back to the State's failure to present the store videotape as his final factual point in closing. He called the State's failure to present the tape "one of the most important things we discovered in this case." *Id.*, at 337, lines 11-15.

11. After trial, Walton subpoenaed the Circle K video to serve as a potential basis for a new trial.

12. The State was unable to locate the Circle K video at that time. See #36, Ex. 47, at 25.

13. Petitioner has not demonstrated by a preponderance of the evidence that the tape never existed, as alleged in the second amended petition. Smolinski testified at trial and again asserted in the declaration submitted for the federal evidentiary hearing that the tape existed and that he turned it over to the police. #36, Ex. 38, at 207-10; Hearing Exhibit 41. Detective Wolfe testified in her deposition testimony for the federal evidentiary hearing that she recalled viewing the videotape with Smolinski but she had no independent recollection of either the content of the tape or the ultimate disposition of the tape. Hearing Exhibit 43, at 42-48 & 55-58. The parties have stipulated that the Las Vegas Metropolitan Police

---

[2] The Court will refer herein to the detective by her last name of Wolfe as of the time of the trial.

1  Department ("Metro") does not currently have the tape and has no record of the tape being
2  impounded or booked into evidence. The parties did not stipulate to the significance of these
3  stipulated facts. The Court does not find based on the foregoing that petitioner has
4  demonstrated that it was more probable than not that the tape never existed. Merely because
5  Metro does not have a tape pertaining to a trial more than a decade ago and has no current
6  record of it does not in any sense establish by a preponderance of the evidence that the tape
7  never existed, contrary to the testimony of two witnesses tending to establish that it did.

8        14. The Court does not find that the fact that there is no current record of the tape
9  being impounded into evidence establishes that it had no evidentiary value for the State.[3]

10       Petitioner seeks to draw such an inference from a Metro Detective Bureau Manual.
11 The manual states that "several factors can account" for items or property not being booked
12 into the evidence vault, including "[a]udio and video tapes which have been determined by
13 the investigator to have no evidentiary value." Hearing Exhibit 38, at 69.

14       However, as Detective Wolfe testified to credibly in her video deposition, the policy
15 manual was only a guide. The investigative units also had policies and practices that they
16 followed that were tailored to the types of investigations that they conducted. Evidence would
17 not inexorably be booked into evidence during an investigation and prior to the particluar case
18 being turned over to the district attorney, in part because of the delays of retrieving evidence
19 from the evidence vault by busy detectives trying to develop an ongoing investigation.
20 Videotapes thus could remain in a case file for an extended period of time without being
21 booked into evidence. The video and the credit card from the Circle K likely would have been
22 forwarded to the forgery unit because a fraudulent credit card transaction fell within their
23 investigative domain. Forgery unit cases were developed differently, and usually over a
24 longer period of time, than the cases developed by the tourist safety unit, which investigated,
25 *inter alia*, Strip pickpocket offenses. Hearing Exhibit 43, at 21-40, 45-48, 55-56 & 58-59.

---

28  [3]Such an allegation goes beyond the second amended petition. Petitioner alleged therein that the tape did not exist, not that it existed but did have any inculpatory evidentiary value.

It thus is hardly inconceivable that the video was forwarded to the forgery detail, remained in their longer-running investigation files, never was sought when the prosecutors were preparing for Ruffin's trial on the pickpocket offenses, and simply was misplaced, lost or destroyed – at some point – without ever having been impounded into evidence for a case pursued by either unit, whether by mere oversight or otherwise with the different investigative domains. The fact that Detective Wolfe did not impound the Circle K video, which pertained directly to a forgery unit offense but instead was only linkage evidence in the case over which she had domain, does not in any sense establish by a preponderance of the evidence that she made a determination that the video had no evidentiary value in her case.

15. In all events, it is entirely speculative at this point as to, *inter alia*, what happened to the Circle K video and when, whether or not the video could have been retrieved with further action by defense counsel prior to trial, whether or not the video would have hurt rather than helped the defense if it had been located prior to trial in response to a defense effort, and/or whether or not Smolinski's testimony about the video could have been excluded based upon whatever surrounding circumstances might have been presented if the video could not have been located at the time of trial in response to a defense request.

16. The state district court asked the venire at the beginning of voir dire whether they were acquainted with "the Defendant, Kevin Tyrone Ruffin, also known as Michael Simmons."[4] Prospective juror Vicky Wells thereafter expressed a concern – during the individual questioning before the entire venire -- that she would not be able to put out of her mind the fact that Ruffin had an alias. She stated that "I only know of one reason why someone would have an alias." After a series of questions seeking to determine whether she could put the

---

[4]Materials in the federal record tend to establish that Michael Simmons is petitioner's real name. When petitioner was taken into custody on March 3, 1999, he executed an intake questionnaire and financial affidavit that identified him as Michael Simmons, under a declaration under penalty of perjury that the facts therein were correct, signing as Michael Simmons with an AKA reference to Kevin Ruffin. #34, Ex. 3, at electronic docketing pages 12-13. The booking sheet refers to his "true name" as Michael Simmons, per his SCOPE sheet, which is a criminal history record maintained by Metro. Hearing Exhibit 43, Ex. 10 (second page). It was stated in a July 14, 1989, prior judgment of conviction that he had fourteen known aliases and seven dates of birth. #38, Ex. 119, at electronic docketing page 24. Another prior judgment of conviction lists eighteen different names. *Id.*, at 23.

matter of the alias out of her mind as a juror, the state trial court excused Wells. Thereafter, at the very end of the day when the court was releasing the venire until the next morning, prospective juror Cindy Joseph echoed Wells' concern as to the alias. Joseph had not been individually questioned prior to that point. After determining that Joseph also was unable to put the matter out of her mind as a juror, the court excused Joseph. #35, Ex. 36, at 5, 72-74 & 99-100.

17. There is no evidence in the state or federal records, over and above the above record established in excusing the two prospective jurors who expressed a bias, affirmatively establishing that petitioner sustained any prejudice from the reference to the alias that would present a reasonable probability of a different outcome at trial, particularly given the evidence against Ruffin on the New York-New York counts.

18. At trial, the State presented a foundation witness from the Bellagio who testified that a videotape marked for identification accurately depicted events that occurred at the Bellagio on February 7, 1999, which was the date of the charged Bellagio offenses. #36, Ex. 39, at 214. Detective Kirk Jordan was asked whether he reviewed videotapes "as to the incidents on February 7th and February 18th." He responded that he had "reviewed the tapes on those instances." *Id.*, at 248, lines 7-9. He testified that when detectives later saw Ruffin he was very close in appearance "to the persons that I had seen in the videotapes of the two previous instances that you had mentioned." *Id.*, at 249, lines 4-5. Detective Wolfe similarly acknowledged that she used "a videotape from February 7th to help identify" Ruffin, being "a videotape taken from the Bellagio." *Id.*, at 283, lines 9-17.

19. Later in the trial, the Bellagio victim, Delores Harris, once again informed the State, through the different prosecutor assigned to the second trial, that the Bellagio video was of a different incident than the one involving her. The trial judge granted defense counsel's motion to exclude the video, finding, *inter alia*, that it would not have been possible to identify Ruffin from the video. #36, Ex. 39, at 297-307.

20. During deliberations, the jury asked:

> Did officers Jordan or Wolfe see the Bellagio video that Mr.

> Torrence [the foundation witness] submitted. Is that how they recognized the Defendant on 3/3/99 or was it from the New York New York tape only?

#36, Ex. 39, at 343. The trial court decided, over defense objection, only to read back the testimony of Detectives Jordan and Wolfe. After the court advised the jury of this on the record, a juror who was not the foreperson, then unilaterally stated:

> We have a question. In the beginning we thought we were going to see the tape of Bellagio and that is what prompted that question, and then when Sammy Torrence came in there was a tape that was brought but it was never evidence and it was just, "Yes, this is a tape that I made." So that was what prompted our question and we just want to know why we didn't get to see that tape and then maybe that will be answered [by the readback].

*Id.*, at 348. The trial court responded:

> . . . . When I said we did something outside your presence, we had a hearing on whether that was to be shown to you. For reasons I will not disclose, I ruled that it was not to be shown to you. So does that answer this or do you still want to hear the testimony of the –

*Id.*, at 348-49. The jury opted to have the readback. *Id.*, at 349.

21. As noted in Finding 2, the jury hung on the Bellagio counts, and those counts later were dismissed. The Supreme Court of Nevada found on direct appeal that "the jury considered the charges separately as indicated by the fact that they did not convict on the Bellagio charges." #37, Ex. 69, at 4.

22. The New York-New York victim, Diana Stubenrauch observed the individual in question in a well-lit elevator on two elevator rides. Although she was not aware at the time of any criminal incident, the individual nonetheless "caught her eye" during the two elevator rides for two reasons. First, she paid attention to the individual on the two elevator rides because she found him to be an attractive and well-dressed man. She testified, when asked whether it was unusual for her to see a well-dressed black man, that "whether they're black or white I always notice a well-dressed man." Second, after immediately recognizing him from the first ride, she thought to herself that she was not the only one who "was as confused as I was about getting up to the room because he was on the elevator again." #36, Ex. 38, at 172-74, 183-85 & 193-94.

23. Stubenrauch further had an additional opportunity to view an image of the individual when she viewed the surveillance video of the incident the next day. This viewing gave her an additional opportunity to observe the features of the individual that were discernible on the video, including a profile of the individual's face. #36, Ex. 38, at 175-78 & 197-98.

24. The description given by Stubenrauch, prior to viewing the video, further was substantially accurate. She described the individual as a black male, approximately six feet tall, wearing a trench coat and sunglasses, and bald. The New York-New York surveillance video reflects that the shorter Stubenrauch was looking up at the individual, and the video showing the hairline on his closely-cropped hair was recorded from a higher vantage point. #36, Ex. 38, at 185-90 & 195-97; Hearing Exhibit 27; see also #36, Ex. 38, at 193 ("I just happened to look up, look over" at the individual's face).

25. Stubenrauch identified Ruffin as the individual in the elevator 48 days after the incident, on April 7, 1999, in court at the preliminary hearing. She was not previously shown a physical lineup, photographic lineup, or other prior one-on-one showup. E.g., #34, Ex. 4; #36, Ex. 38, at 181, 191 & 198.[5]

26. Stubenrauch testified at trial that she was "one hundred percent" sure of the identification. #36, Ex. 38, at 190-91. She noted that Ruffin's hair and facial hair were different at trial, but "[h]is eyes were the same." *Id.*, at 173.

27. Walton made a strategic decision to attack the reliability of the identification testimony – including that by both the Bellagio and New York-New York victims – in the case by cross-examination and in closing argument rather than by an objection to admissibility. He did not want to highlight for what he found to be a "smug" or overconfident prosecution the areas that he wanted to attack in the identification testimony by objecting pretrial. He further

---

[5]The Court would note that while Ruffin may have had the same or similar sunglasses at the April 7, 1999, preliminary hearing as did the individual in the elevator on February 18, 1999, the sunglasses that he had with him at least at his arrest on March 3, 1999, were impounded into evidence. And remained so up through the trial. See #36, Ex. 39, at 270-72 & 275 (Detective Wolfe); Hearing Exhibit 28.

did not believe that a pretrial motion would be granted by the trial judge in question, particularly as to the Stubenrauch identification given, *inter alia*, the witness' level of certainty at the preliminary hearing.

28. Petitioner has not presented any evidence tending to establish that a New York-New York bell captain would have disputed Stubenrauch's identification of Ruffin.

29. Walton also made a strategic decision to not bring further attention, and effort, to the identification issue by what he deemed to be a "smug" or overconfident prosecution by seeking a defense identification expert. Even if a motion for an expert potentially could have been filed *ex parte* without giving extensive reasons, the defense thereafter would have been required to file a notice as to the expert with the expert's report. Moreover, the client, Ruffin, was insisting on a speedy trial setting, and retaining an expert would have required a continuance. Additionally, the trial judge would not have been disposed to delaying the proceeding. By seeking to retain an expert, counsel therefore would have been bringing the prosecution's attention to the issue even more and would have been countering the wishes of both his client and the trial judge to bring the matter on to trial. Counsel chose instead to focus his limited (at his client's behest) time on challenging the identification testimony in the case through cross-examination and closing argument.

30. There is not a reasonable probability that the expert identification testimony presented at the federal evidentiary hearing, or substantially comparable testimony, would have altered the outcome at trial.

31. The expert identification testimony presented at the federal evidentiary hearing further was based in part on federal guidelines, applicable to law enforcement officers, that were not adopted until after Ruffin's trial.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter under 28 U.S.C. § 2254(a).

2. The claims of ineffective assistance of trial counsel reviewed herein are reviewed *de novo* in this particular case. See #66, at 35-41; #81.

/ / / /

3. While review is *de novo* in this case, the governing standard of review on the merits of the claims of ineffective assistance of counsel nonetheless is highly deferential. *See, e.g., Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (referring to AEDPA review of ineffective assistance claims as "doubly deferential" when the deferential AEDPA standard of review is applied to claims reviewed under the "highly deferential" substantive standard otherwise applicable to the merits of ineffective assistance claims).

4. Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a petitioner must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. 466 U.S. at 687, 104 S.Ct. 2064. In this regard, "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation . . . [but instead is] simply to ensure that criminal defendants receive a fair trial." 466 U.S. at 689, 104 S.Ct. at 2065. Accordingly, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686, 104 S.Ct. at 2064. As the *Strickland* Court acknowledged, "[t]here are countless ways to provide effective assistance in any given case," such that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689, 104 S.Ct. at 2065. The Supreme Court accordingly recently reiterated that "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter*, 562 U.S. ___, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011)(quoting *Padilla v. Kentucky*, 559 U.S. ——, ——, 130 S.Ct. 1473, 1484, 176 L.Ed.2d 284, (2010)). The *Strickland* standard must be applied with "scrupulous care." *Richter*, 562 U.S. at ___, 131 S.Ct. at 788.

5. On the performance prong, the *Strickland* Court, recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 689-90, 104 S.Ct. at 2065-66. To overcome this "strong presumption," the petitioner

must show that counsel failed to act "reasonabl[y] considering all the circumstances." 466 U.S. at 688, 104 S.Ct. at 2065.

6. On the prejudice prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068. Under this standard, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A reasonably probability requires a "substantial," not merely a "conceivable" likelihood of a different result. *Richter*, 562 U.S. at ——, 131 S.Ct. at 791.

7. Applying these standards to Ground 6, petitioner was not denied effective assistance of trial counsel with regard to this claim, given Findings 7 through 15 and Conclusions 8 and 9. In Ground 6, petitioner alleges that he was denied effective assistance when trial counsel failed to conduct any pretrial investigation regarding a Circle K videotape. The Circle K store manager, Dan Smolinski, testified that he was recognized Ruffin as the person who used the New York-New York victim's credit card at the store from a store security videotape. Smolinski testified that he gave the tape to the police, but there is no record of the tape being impounded into evidence. The Court reviews this claim first because the inclusion of Smolinski's testimony linking Ruffin to the victim's credit card in the quantum of evidence considered potentially impacts the consideration of any prejudice issue on other claims.

8. Trial counsel's performance did not fall below an objective standard of reasonableness in opting to not investigate the Circle K evidence further before trial. Counsel knew of the Circle K surveillance video and requested to see it before trial. However, he made a strategic decision to not press the matter further prior to trial. He did so to avoid being the cause of the State introducing evidence that he had been informed was inculpatory and which would show another alleged criminal act by Ruffin. When the State did not present the Circle K video at trial, he used that fact to argue that the State's failure to present the tape meant that it did not support Smolinski's testimony. Such a approach potentially would allow counsel to potentially seek a new trial after conviction based upon the tape in a risk-free strategy. If the tape inculpated Ruffin, he already stood convicted. If the tape was

exculpatory, he would have a solid basis for a new trial.  While not all criminal defense attorneys would pursue such a strategy, this strategic choice did not fall below an objective standard of reasonableness in the circumstances presented to counsel at the time.

9. Petitioner has not demonstrated prejudice under *Strickland* from any *arguendo* deficient performance from trial counsel's action or inaction with regard to investigation of Smolinski's testimony and/or the Circle K video.

Petitioner clearly has not demonstrated by a preponderance of the evidence that the Circle K video never existed, as a basis for allegedly excluding Smolinski's testimony, as was alleged in the second amended petition as the basis for this claim.

Petitioner now seeks to posit – in a claim that in truth goes beyond the allegations of the second amended petition – that the video existed but necessarily had no inculpatory evidentiary value because Detective Wolfe allegedly made a decision to not impound the tape following a determination that it had no evidentiary value.  As discussed in more detail in Finding 14, the evidence does not preponderate in support of such an inference – even if such a claim *arguendo* properly is before the Court.

At this point, it is entirely speculative as to: (a) what actually happened to the video and when, including whether or not it was impounded and why, whether it was impounded but the record of it being impounded was not kept or was lost, and/or whether the video was lost at some later time; (b) whether or not the video would have been subject to being located at the time of any pretrial investigation by defense counsel; (c) whether or not the video, if located, would have helped the defense; and/or (d) whether or not Smolinski's testimony about the video, if it could not be located, could have been excluded based upon the surrounding circumstances presented at that time about the inability to locate the video at that time.

The petitioner at all times bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 131 S.Ct. at 1398.  Speculation as to events and evidence long since lost to the ravages of time does not carry that burden of proof.  If the evidence is lost and the circumstances of its loss cannot be established by a preponderance of the evidence, petitioner simply has failed to carry his burden of proof on

federal habeas review in attacking a presumptively valid state court judgment of conviction. Petitioner accordingly has failed to establish that there was a reasonable probability of a different outcome at trial had trial counsel investigated Smolinski's testimony and the Circle K video more prior to trial.

10. Petitioner was not denied effective assistance of trial counsel with regard to Ground 2, in connection with Findings 16 and 17. In Ground 2, petitioner alleges that he was denied effective assistance when trial counsel failed to object during voir dire to the state trial court's reference to petitioner's alias. Petitioner has not demonstrated that there was a reasonable probability of a different outcome at trial but for any *arguendo* deficient performance by counsel in this regard. Petitioner has not cited any apposite Nevada state case law establishing that an objection by counsel would have led to a reversal of the conviction and/or any other result at or following the trial. Petitioner, again, has the burden of proving that he is entitled to habeas relief. *Pinholster, supra*. In federal criminal trials, an *arguendo* improper reference to a defendant's alias potentially would provide a basis for grant of a motion to strike and a jury admonition but not an automatic basis for reversal. *See,e.g., United States v. Clark*, 541 F.2d 1016, 1019 (4th Cir. 1976). Given the evidence against petitioner, including the evidence that he used the victim's credit card after the incident, there is not a reasonable probability of a different outcome at trial in the absence of the reference to the alias during voir dire.

11. Petitioner was not denied effective assistance of counsel with regard to Ground 3, in connection with Findings 3 to 4 and 18 through 21. In Ground 3, Ruffin alleges that he was denied effective assistance when trial counsel failed to object to references in the State's witness' testimony to a videotape of an incident from the Bellagio that was ruled inadmissible later in the trial. Petitioner has not demonstrated that there was a reasonable probability of a different outcome at trial but for any *arguendo* deficient performance by counsel in this regard. Although this Court's review of the application of *Strickland* is *de novo* in this case, state court findings of fact nonetheless are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1) unless rebutted by clear and convincing evidence. The Supreme Court

of Nevada found that the jury considered the charges separately as indicated by the fact that they did not convict on the Bellagio charges. #37, Ex. 69, at 4; #38, Ex. 110, at 5. Petitioner has not rebutted this factual finding with clear and convincing evidence. Moreover, given the evidence against petitioner on the New York-New York counts, including the evidence that he used the victim's credit card after the incident, there is not a reasonable probability of a different outcome at trial in the absence of testimony regarding a Bellagio video.

12. Petitioner was not denied effective assistance of trial counsel with regard to Ground 5, given Findings 22 through 27 and Conclusions 13 and 14. In Ground 5, petitioner alleges that he was denied effective assistance when trial counsel failed to object to allegedly unreliable identification testimony by State witness Diana Stubenrauch on the New York-New York incident.

13. Trial counsel's performance did not fall below an objective standard of reasonableness when he did not object to Stubenrauch's identification testimony as unreliable. Counsel made a strategic decision to attack the reliability of the identification testimony in the case by cross-examination and in closing argument. He did not want to highlight for what he found to be a "smug" or overconfident prosecution the areas that he wanted to attack in the identification testimony by objecting pretrial. He further did not believe that a pretrial motion would be granted by the trial judge in question, particularly as to the Stubenrauch identification given, *inter alia*, the witness' stated level of certainty at the preliminary hearing. Such a strategic decision by trial counsel following investigation and an evaluation of the case is "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066.

14. Petitioner has not demonstrated prejudice under *Strickland* from any *arguendo* deficient performance from trial counsel's decision to not object to Stubenrauch's identification testimony.

Petitioner questions the reliability of Stubenrauch's identification. However, petitioner, who has the burden of proof on federal habeas review, has not come forward with factually apposite case citation – as opposed to argument from general principles – demonstrating a

-14-

1  reasonable probability that Stubenrauch's identification testimony would have been excluded
2  if only counsel had objected to its admissibility.
3        This Court, on an independent *de novo* review, is not persuaded that there was a
4  reasonable probability that an objection would have lead to exclusion of Stubenrauch's
5  identification testimony. Under the governing law, "reliability is the linchpin in determining the
6  admissibility of identification testimony." *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97
7  S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Courts considering a claim that admission of the
8  identification testimony violates due process look to the following factors:

> . . . . The factors . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

13  *Id*. This same reliability standard governs the admissibility of both the initial identification and
14  any subsequent in-court identification. *See,e.g. Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct.
15  375, 381-82, 34 L.Ed.2d 401 (1972); *see also Manson*, 432 U.S. at 110 n.10, 97 S.Ct. at 2251
16  (under the totality of the circumstances approach followed by the Supreme Court, "if the
17  challenged identification is reliable, then testimony as to it and any identification in its wake
18  is admissible").
19        In the present case, Stubenrauch observed the individual in the well-lit elevator on two
20  elevator rides. Although she was not aware at the time of any criminal incident, the individual
21  nonetheless "caught her eye" during the two elevator rides for two reasons. First, she paid
22  attention to the individual on the two elevator rides because she found him to be an attractive
23  and well-dressed man. Second, after immediately recognizing him from the first ride, she
24  thought to herself that she was not the only one who "was as confused as I was about getting
25  up to the room because he was on the elevator again." The situation is not one where an
26  individual merely took an elevator ride or rides and did not pay attention to an otherwise -- to
27  her -- nondescript person who happened also to be on the elevator. Stubenrauch had the
28  opportunity to view the individual face-to-face during two elevator rides in which she actually

noticed and took notice of the individual, immediately remembering him when she saw the attractive, well-dressed man again on the second elevator ride.

Stubenrauch further had an additional opportunity to view an image of the individual when she viewed the surveillance video of the incident the next day. While the Court is not persuaded that this viewing opportunity constituted an actual identification of *Ruffin* as the individual in question, Stubenrauch did recognize the individual that she saw in the elevator on the two elevator rides in the video. This viewing gave her an additional opportunity to observe the features of the individual that were visible on the video, including a facial profile.

The description given by Stubenrauch, prior to viewing the video, further was substantially accurate. She described the individual as a black male, approximately six feet tall, wearing a trench coat and sunglasses, and bald. While the individual in the video had extremely close-cropped hair rather than a technically fully bald head, there is a certain inexactitude to the term "bald." For example, the term "bald" similarly was used by counsel and a witness at one point during preliminary hearing while questioning Detective Wolfe regarding the Bellagio elevator surveillance video, in describing the depiction of the individual in the video. #34, Ex. 4, at 80-81. The shorter Stubenrauch of course was looking up at the individual, and the New York-New York surveillance video showing the hairline on his closely-cropped hair was recorded from a higher vantage point. In all events, a witness' description of the criminal need not be accurate in each and every jot and tittle for identification testimony to be admissible over objection.

Stubenrauch further expressed one hundred percent certainty in her identification.[6] Petitioner's expert on federal habeas review expressed doubt as to the validity of this criterion in assessing reliability of an identification. Under the controlling law established by the United States Supreme Court, however, the witness' degree of certainty is a factor weighing in favor of reliability and admission of the testimony over objection. The Supreme Court's statement

---

[6]The Court notes that the sunglasses, in the main, were on the top of the individual's head in the surveillance video, such that his eyes were visible to Stubenrauch.

of the applicable law overrides any contrary opinion by a psychologist in determining whether identification testimony is admissible.

Stubenrauch further identified Ruffin as the man in the elevator only 48 days after the incident, not months or years later. While an identification even earlier in time of course would have made the case for reliability even stronger, the interval involved did not render the identification inherently unreliable.

The procedure of having Stubenrauch identify Ruffin for the first time in court at the preliminary hearing undeniably was a suggestive procedure. Ruffin then would be sitting at counsel table with his attorney (who also was black). However, the suggestiveness of the identification procedure is a factor to be weighed against the indicia of reliability. When the suggestiveness of the identification procedure is weighed against Stubenrauch's opportunity to view the criminal, her degree of attention, the accuracy of her prior description, her level of certainty, and the comparatively short time involved, the Court is not persuaded that there is a reasonable probability that an objection to the reliability of her identification testimony would have led to a different outcome at Ruffin's trial.

15. Petitioner was not denied effective assistance of trial counsel with regard to Ground 7, given Findings 28 through 31 and Conclusions 16 through 18. In Ground 7, petitioner alleges that he was denied effective assistance when trial counsel (a) failed to develop any witnesses for the defense, such as a New York-New York casino bell captain who potentially could have disputed Diana Stubenrauch's identification of Ruffin as the black male on the elevator; and (b) failed to retain an identification expert who allegedly could have demonstrated that the identifications made by Stubenrauch, Dan Smolinski, and Dolores Harris (from the Bellagio incident) were inherently untrustworthy.

16. Petitioner's claim as to the bellhop captain was wholly unsupported by any evidence at the evidentiary hearing. This portion of the claim fails for lack of proof.

17. Trial counsel's performance did not fall below an objective standard of reasonableness when he did not retain an identification expert.

/ / / /

Counsel made a strategic decision to not bring further attention, and effort, to the identification issue by what he deemed to be a "smug" or overconfident prosecution by seeking a defense identification expert. Even if a motion for an expert potentially could have been filed *ex parte* without giving extensive reasons, the defense thereafter would have been required to file a notice as to the expert with the expert's report. Moreover, the client, Ruffin, was insisting on a speedy trial setting, and retaining an expert would have required a continuance. Additionally, the trial judge would not have been disposed to delaying the proceeding. By seeking to retain an expert, he therefore would have been bringing the prosecution's attention to the issue even more and would have been countering the wishes of both his client and the trial judge to bring the matter on to trial. Counsel chose instead to focus his limited (at his client's behest) time on challenging the identification testimony through cross-examination and closing argument. Such a strategic decision by trial counsel following evaluation of the case again is "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066.

Moreover, the expert testimony presented at the federal evidentiary hearing was in not insubstantial part based upon federal guidelines – applicable to law enforcement officers – that were not adopted until *after* Ruffin's trial. Under *Strickland*, counsel's decisions must be evaluated from counsel's perspective at the time. 466 U.S. at 689, 104 S.Ct. at 2065. Clearly, petitioner could not have retained an expert at Ruffin's trial to provide expert testimony based upon federal guidelines that did not even exist at the time. The Court would not find counsel's performance deficient in any event on the evidence presented at the evidentiary hearing. However, the fact that the expert was relying on guidelines that did not exist at the time only further reinforces the Court's conclusion on this issue.

18. Petitioner has not demonstrated prejudice under *Strickland* from any *arguendo* deficient performance from trial counsel's decision to not retain an identification expert. Following consideration of the expert testimony presented at the federal evidentiary hearing, the Court has every confidence that there was not a reasonable probability that presenting substantially comparable testimony -- to the extent available at the time and to the extent such

testimony *arguendo* would be have been admissible under Nevada law – at Ruffin's trial would have led to a different outcome. In the Court's view, there is not a reasonable probability that the presentation of comparable testimony would have led a jury to reach a different conclusion than that reached by the jury based upon the evidence presented at Ruffin's trial.

19. Ground 7 was not rendered unexhausted and/or untimely by the presentation of the expert testimony at the federal evidentiary hearing. Respondents urge that the state courts properly rejected the claim without a hearing on the ground that the claim was conclusory. The state district court, however, relied upon N.R.S. 34:370(4) in denying the petition without an evidentiary hearing on the premise that petitioner was required to attach affidavits, records or other evidence supporting the allegations of the petition. The Supreme Court of Nevada – the final arbiter of Nevada law – held that the state district court erred in imposing an improper requirement that the claims be supported by attached affidavits and evidence. The state supreme court concluded that the error nonetheless was harmless, based upon its disposition of the claims. #38, Ex. 110, at 6 n.12. Petitioner's presentation of an identification expert at the hearing did not fundamentally alter the claim presented in the state courts and thus did not render the claim unexhausted (or, by extension, untimely). *See Vasquez v. Hillery*, 474 U.S. 254, 260, 106 S.Ct. 617, 621-22, 88 L.Ed.2d 598 (1986); *Lopez v. Schriro*, 491 F.3d 1029, 1040 (9 Cir. 2007).

20. Given Conclusions 7 through 18, petitioner has not established a basis for federal habeas relief on the petition, as amended. The Court is not persuaded on *de novo* review that Petitioner has established a basis for federal habeas relief, given the findings and conclusions made herein.

21. Given the factual findings made herein, reasonable jurists would not find the Court's rejection of Grounds 2, 3, 5, 6 and 7 herein to be debatable or wrong, for the reasons assigned in Conclusions 7 through 18.

22. Reasonable jurists would not find the Court's rejection of Grounds 1, 8, 9 and 10 to be debatable or wrong, for the reasons assigned in the Court's prior order (#66).

If any Finding of Fact is considered to be a Conclusion of Law, or any Conclusion of Law is considered to be a Finding of Fact, it is the Court's intention that it be so considered.

ORDER

IT THEREFORE IS ORDERED that the petition for a writ of habeas corpus, as amended, is DENIED on the merits and that the action shall be DISMISSED with prejudice.

IT FURTHER IS ORDERED, following upon Conclusions 21 and 22, that a certificate of appealability is DENIED.

The Clerk of Court shall enter final judgment accordingly in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED: October 11, 2011.

_____
ROGER L. HUNT
United States District Judge